Vernon T. FRANKLIN, a/k/a Yusuf A. Malik, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1366.

District of Columbia Court of Appeals.

Argued Jan. 5, 1989.

Decided March 17, 1989.

---

Stephen D. Scavuzzo, Alexandria, Va., appointed by this court, for appellant.

Edith S. Marshall, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before MACK, BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant was charged with assault,[1] possession of a prohibited weapon (PPW),[2] carrying a pistol without a license,[3] possession of an unregistered firearm,[4] and possession of ammunition without a valid registration certificate.[5] He was convicted of all these offenses except the assault; on that charge the jury deadlocked, and the court declared a mistrial.[6] On appeal he contends that the trial court committed reversible error by allowing him to be impeached with a prior jury verdict of guilty even though no sentence had yet been entered on that verdict, arguing that a mere verdict is not a "conviction" as that term is used in D.C.Code § 14–305 (1981). We agree that the trial court erred, and we hold that the error was not harmless. We therefore reverse the judgment of conviction.

I

Wallace Najiy is the owner of a locksmith shop in Northeast Washington. He testified that on February 2, 1985, at about 10:00 a.m., he was about to enter his shop when appellant ran up to him, held a pistol to his head, and demanded that Najiy pay him $1300 which appellant said Najiy owed

---

1. D.C.Code § 22–504 (1981).

2. D.C.Code § 22–3214(b) (1981).

3. D.C.Code § 22–3204 (1981).

4. D.C.Code § 6–2311(a) (1981).

5. D.C.Code § 6–2361 (1981).

6. The government later dismissed the assault charge.

him. Appellant threatened to "blow [Najiy's] head off" if he refused to comply. When Najiy said he did not have any money, appellant insisted that he write him "a check or something." Stalling for time, Najiy suggested that they go inside the shop. Appellant agreed and lowered the gun, placing it in the pocket of the brown leather coat he was wearing. Both men then entered the shop, and Najiy directed his wife to write a check for appellant. Najiy then persuaded appellant to wait with him outside so that they might discuss the situation further. As soon as the two men went out the door, Najiy's wife and son, while ostensibly preparing a check, called the police. Within minutes a police officer arrived, found the pistol in appellant's coat pocket, and placed him under arrest.

Officer John Diehl of the Metropolitan Police testified that he went to Mr. Najiy's shop in response to a radio run. As he approached the shop, he saw appellant walking across the street, moving away from Najiy. Officer Diehl asked appellant if he had a gun, but appellant did not respond. Diehl then reached into the right front pocket of appellant's brown leather coat and removed a .32 caliber five-shot revolver, which was fully loaded and operable. Other evidence established that neither the pistol nor the ammunition was properly registered, and that appellant did not have a license to carry a pistol in the District of Columbia.

Appellant's version of the facts was very different and entirely exculpatory. He denied having held a gun to Najiy's head and said that he had never before seen the pistol which Officer Diehl removed from his coat. According to appellant, he had lent Najiy $1300 approximately two years earlier and had repeatedly requested payment. On the morning of February 2, appellant testified, when he saw Najiy driving his car, he pulled his own car alongside Najiy's and once again asked Najiy for the

$1300. Najiy responded by inviting appellant into his shop. The two men parked and went inside, but their discussion brought no agreement over the debt. Appellant testified that he then picked up his brown leather coat, which he said he had left in Najiy's shop about a month earlier and which was lying on the floor "with all the locks and the doorknobs and everything else...." He left the shop, but as soon as he stepped outside, he was stopped by Officer Diehl and asked if he had a pistol, to which he replied, "No, sir." The officer then removed from appellant's coat pocket the pistol which he had not known was there.

In rebuttal the government called Kenneth Najiy, the complainant's son, who testified that appellant was wearing the brown leather coat when he first entered the shop, and that appellant had not left the coat in the shop during the month prior to his arrest.

After lengthy argument, and over defense counsel's objection, the trial court permitted the government to impeach appellant's credibility by asking him about two previous "convictions." Both were for PPW, one of the offenses with which appellant was charged in the case at bar; one had occurred in 1979 and the other in 1986. At the time of the trial in this case, however, the court had not yet imposed sentence in the 1986 matter, although a jury had found appellant guilty.

By coincidence, the judge who tried the instant case was the same judge who had presided at appellant's trial for the 1986 PPW. The judge recalled that trial and noted that he had denied all of appellant's post-trial motions to set aside the verdict, so that the imposition of sentence was all that remained to be done. The judge recognized that appellant could be impeached with the 1986 jury verdict only if a verdict of guilty were deemed a "conviction" within the meaning of D.C.Code § 14–305 (1981).[7] Reasoning that the only unfin-

---

7. D.C.Code § 14–305 provides, with certain exceptions and limitations, that "for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination of the witness or by evidence aliunde...." *See generally Dixon v. United States,* 287 A.2d 89 (D.C.), *cert.*

ished business in the 1986 PPW case was the formality of sentencing, since all the post-trial motions had been denied, the judge concluded that the 1986 PPW jury verdict could be used for impeachment purposes because there was no likelihood that the verdict might be set aside or that sentence might not be imposed.

## II

██ The trial court erred in allowing appellant to be impeached with the verdict of guilty in the 1986 PPW case. A guilty verdict is not a "conviction" that may be used to impeach a witness under D.C.Code § 14–305 (1981). That point was settled beyond dispute by our decision in *Langley v. United States*, 515 A.2d 729, 734 (D.C. 1986), in which this court unequivocally held that "a defendant (or any other witness) may not be impeached with a prior guilty verdict unless and until there is a judgment of conviction premised on a sentence." A few years earlier, in *Godfrey v. United States*, 454 A.2d 293, 305 (D.C. 1982), we had held that a guilty plea was not a conviction within the meaning of section 14–305 and thus could not be used for impeachment. *Accord, United States v. Lee*, 166 U.S. App.D.C. 67, 72, 509 F.2d 400, 405 (1974), *cert. denied*, 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975); *Crawford v. United States*, 59 App.D.C. 356, 357, 41 F.2d 979, 980 (1930); *see also Thomas v. United States*, 74 App.D.C. 167, 169, 121 F.2d 905, 907 (1941). Although the precise question of whether a guilty verdict constitutes a "conviction" within the meaning of section 14–305 was not raised in this court in any case before *Langley*,[8] the holding of *Langley* was foreshadowed by prior case law. As far back as 1930, the highest court of the District of Columbia held that it was "settled law that to constitute a conviction, within the terms of [the predecessor of section 14–305], there must not only be a plea of guilty, or

the verdict of guilty by a jury, but this must be followed by a judgment and sentence of the court." *Crawford v. United States, supra*, 59 App.D.C. at 357, 41 F.2d at 980 (citations omitted).[9]

In *Langley* this court, remarking that some federal courts allow impeachment under Fed.R.Evid. 609 with a guilty verdict before sentence is imposed on that verdict, expressed its reluctance to follow suit "absent a showing ... that a verdict is tantamount to a judgment and sentence." 515 A.2d at 735 (footnote omitted). Seizing on this language, the government argues that *Langley* does not apply here because appellant's 1986 verdict was "tantamount to" a sentence, in that all post-trial motions had been denied, and only the formality of sentencing lay ahead. In so arguing, the government misses the point we were trying to make in the *Langley* opinion. *Langley* was a case of statutory construction, interpreting the meaning of the words "conviction" and "convicted" in section 14–305. The language on which the government relies was part of our explanation of why we read section 14–305 differently from the way some federal courts had read Fed.R.Evid. 609. Contrary to the government's belief, we were not suggesting that there might be a loophole in section 14–305 of the sort that the federal courts had found in the federal rule. As the rest of the opinion made clear, section 14–305 was intentionally written without such a loophole. *Langley* held once and for all that a "conviction" under section 14–305 has only one meaning, and that is "a judgment of conviction based on a sentence." *Id.* at 733 (citations omitted). Consequently, whether appellant's guilty verdict in the prior case was "tantamount to" a sentence is essentially irrelevant.

## III

██ The government argues in the alternative that even though the trial court may

---

denied, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972).

**8.** We note that this case was tried three months before *Langley* was decided.

**9.** As the Supreme Court has held, albeit in a different context, "[f]inal judgment in a criminal case means sentence. The sentence is the judgment." *Berman v. United States*, 302 U.S. 211, 212, 58 S.Ct. 164, 166, 82 L.Ed. 204 (1937).

have erred in this case, its error was harmless. The test for determining harmlessness is a familiar one: whether a reviewing court can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *accord, e.g., Hinnant v. United States*, 520 A.2d 292, 295 (D.C.1987) (error held harmless where court was "fully satisfied that the verdict would have been the same" if the error had not occurred, citing *Kotteakos*). Without this degree of certainty, "it is impossible to conclude that substantial rights were not affected." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. In deciding whether an error is impermissibly prejudicial, "the decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. United States*, 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnotes omitted); *accord, e.g., Dyson v. United States*, 418 A.2d 127, 132 (D.C. 1980). Applying these principles to the instant case, we conclude that the case was a close one, that the issue affected by the error was crucial, and that the steps taken to mitigate the error, while substantial, were not sufficient to counteract the prejudice.

First, we cannot agree with the government that the evidence was "overwhelming." Officer Diehl testified that he found a pistol in appellant's coat pocket, but this was really undisputed. Appellant claimed that he did not know the pistol was there, and that his coat had been in Mr. Najiy's shop for about a month before he put it on that day. There was thus no inconsistency between Diehl's and appellant's testimony. Nor can we accept the government's assumption that appellant would not have been without a coat in February. It is common knowledge that even in the depth of winter there are occasional balmy days, and there was no evidence at all about the weather conditions on the date of appellant's arrest.[10] The trial was essentially a credibility contest between appellant's testimony on the one hand and that of Mr. Najiy and his son on the other. Najiy was the only witness who testified that appellant actually held the pistol in his hand, but apparently the jury did not accept Najiy's testimony as wholly true, for it was unable to reach a verdict on the assault count.

Second, the issue affected by the error was central to the case, which militates against our finding the error harmless. Appellant was impeached with two purported convictions, and the jury was told three times, twice by the court in limiting instructions and once by the prosecutor in closing argument, that these convictions could be considered in assessing appellant's credibility. The credibility of appellant's testimony was central to his defense. He was his own sole witness, and his account of what happened was his only shield against a conviction. While that account may strike the government, or even this court, as unlikely and far-fetched, appellant had the right to have the *jury* decide whether it was sufficiently credible to raise a reasonable doubt as to his guilt. Because the improper impeachment was a direct attack on his credibility, we cannot say "with fair assurance ... that the judgment was not substantially swayed by the error...." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

Finally, we recognize that the steps taken by the trial court to mitigate the error were substantial. The court required the government to impeach appellant with both convictions at the same time, and not "in

---

10. The government also argues that appellant's testimony was "inherently implausible" because it was highly unlikely that he was unaware of the presence of the pistol in his pocket. This is speculative and may very well be incorrect. The evidence showed that appellant's coat was full-length and made of leather, which would make it a relatively heavy garment. Although the pistol itself was in evidence, we cannot determine from the record the relative weights of the pistol and the coat. Since .32 caliber pistols can range in size from tiny to fairly large, it is entirely possible that appellant might not have known, unless he had placed it there, that the pistol was in the pocket of the coat.

close proximity to other questions" related to his possession of the pistol. It also restricted the government to confronting appellant with the fact of a 1986 conviction, omitting any mention that the guilty verdict had been returned only a few days before the instant trial. Further, the court gave an immediate limiting instruction and repeated the instruction in its final charge to the jury. Nevertheless, given the closeness of the case and the importance of appellant's credibility to his defense, we can only conclude that these measures were insufficient to overcome the obvious prejudice that flowed from the improper impeachment.

The government relies chiefly on two cases to support its harmless error argument, *Oliver v. United States*, 384 A.2d 642 (D.C.1978), and *Hale v. United States*, 361 A.2d 212 (D.C.1976). We find them both distinguishable from the case at bar. In *Oliver* the defendant was impeached with two convictions, but both were for crimes different from the one for which he was on trial. Although one of these impeachments was improper, we held that the error was harmless beyond a reasonable doubt [11] given the "overwhelming weight of the government's evidence...." 384 A.2d at 645.[12] In the present case, however, appellant was impeached with two PPW convictions, and one of the crimes with which he was charged was PPW. Further, while the case against the defendant in *Oliver* included the testimony of a disinterested passer-by, the principal witness against appellant was Mr. Najiy, a man who previously knew appellant and allegedly owed him a large sum of money which appellant had tried in vain to collect.

As we have noted, the jurors apparently did not accept Najiy's testimony in its entirety, or else they would not have deadlocked on the assault charge. In light of these differences, we cannot look to *Oliver* as an apt precedent here.

The *Hale* case is no more supportive of the government's position. In *Hale* the defendant was properly impeached with one conviction, but improperly impeached with a second conviction that had been reversed on appeal. Both convictions were for crimes other than the one charged. We found this error harmless, as in *Oliver*, because the government's evidence was "overwhelming." *Hale, supra*, 361 A.2d at 215.[13] In the instant case, however, appellant was impeached with two offenses identical to one of those with which he was charged, and, as we have noted, the government's evidence was decidedly underwhelming. Consequently, while the error in *Hale* was deemed harmless, *Hale* is not close enough on its facts to enable us to reach the same conclusion in this case.

Appellant's convictions must therefore be reversed and this case remanded for a new trial.

Reversed and remanded.

---

[11]. The *Oliver* court applied the reasonable doubt standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), because a constitutional error was involved, in that one of the prior convictions used for impeachment had been unconstitutionally obtained. *See Oliver, supra*, 384 A.2d at 644. The instant case, however, does not require us to find the error harmless beyond a reasonable doubt because impeachment with a mere guilty verdict, on which no sentence has been imposed, does not affect constitutional rights. As we noted in *Langley*, some federal courts have upheld this practice pursuant to Fed.R.Evid.

609. *See Langley, supra*, 515 A.2d at 734 (citing cases).

[12]. The defendant in *Oliver*, while fleeing from the scene of an armed robbery, was chased by the robbery victim. The victim and a passer-by caught up with him, subdued him, and turned him over to the police.

[13]. The defendant in *Hale* was arrested at the scene of the shooting by two police officers who had heard the shot, and was identified immediately by the victim.